## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| INFORMATION ASSOCIATED WITH 207- ) | Case No.2:23-mj-00177-KFW |
| 461-5744 THAT IS STORED AT PREMISES ) | |
| CONTROLLED BY U.S. CELLULAR ) | <u>Filed Under Seal</u> |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Adam Morin, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a particular account that is stored at premises owned, maintained, controlled, or operated by U.S. Cellular, a wireless telephone provider headquartered at 8410 West Bryn Mawr Ave., Chicago, IL 60631. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require U.S. Cellular to disclose to the government information in its possession pertaining to the subscriber or customer associated with this account, including the contents of communications.

2. As described in further detail below and in Attachment A, the government is seeking information regarding the U.S. Cellular account associated with the cellular telephone assigned call number 207-461-5744 (the "Target Cell Phone") for whom the listed subscriber is Spencer Thompson and the authorized contact is Ashley Roberts.[1] The items to be seized by the government are described in further detail below and in Attachment B.

---

[1] Based on my direct involvement in this investigation, I know that Thompson and Roberts are romantically involved and reside together at 40 Pikes Hill Road, Norway, Maine. As explained more fully herein, there is probable cause to believe that Roberts is the primary user of the Target Cell Phone.

3. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI"), since May 2017, and am I currently assigned to work in the Portland, Maine Resident Agency. I previously served as a Patrol Officer with the Portland, Maine Police Department from 2013 until 2017. Over the course of my law enforcement career, I have participated in numerous drug trafficking investigations, pursuant to which I have utilized various investigative tools and techniques, including search warrants.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841, 843, and 846 (drug trafficking, unlawful use of a communications facility, and conspiracy to commit drug trafficking) have been committed, are being committed, and will be committed by Ashley Roberts ("Roberts") and other unknown subjects in the District of Maine. There also is probable cause to believe that Roberts has used, is using, and will continue to use the Target Cell Phone in furtherance of these drug-related crimes. Accordingly, there is probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

6. This Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, this Court is a district court of the United States, including a magistrate judge of such a court, with jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

7.     Members of law enforcement, led by the FBI, are conducting an ongoing covert criminal investigation regarding possible violations of Title 21, United States Code, Sections 841, 843, and 846 (drug trafficking, unlawful use of a communications facility, and conspiracy to commit drug trafficking) involving Roberts and other unknown subjects in the District of Maine. Pursuant to this investigation, a Confidential Human Source (CHS)[2] disclosed to law enforcement that a female who CHS knew as "Ashly" was using the Target Cell Phone to exchange drug-related communications.

8.     During April 2023, law enforcement directed CHS to communicate with the Target Cell Phone to arrange a controlled purchase for methamphetamine. According to CHS, a controlled purchase for approximately four ounces of methamphetamine was arranged by text message on about April 11, 2023. I have reviewed and retained screenshots of the text message conversations between CHS and Target Cell Phone.

9.     On about April 18, 2023, law enforcement met with CHS and equipped CHS with a live-monitoring electronic recording device. While under my direction and supervision, CHS texted "On my way" to the Target Cell Phone to which the Target Cell Phone replied "Okay" and "What time you think you can be here I'm headed to auburn I'll be back in a bit though[.]" I have reviewed and retained screenshots of these text messages. CHS then drove to Roberts' residence at 40 Pikes Hill Road in Norway, Maine, which CHS was familiar with due to past drug purchases.

---

[2] CHS cooperated with law enforcement with the hopes of receiving prosecutorial or judicial consideration after being charged by local police for drug trafficking in early 2023. CHS told law enforcement that CHS did not personally use methamphetamine or opioids. CHS conducted one prior successful controlled purchase under the FBI's direction and supervision, which resulted in the seizure of a quantity of drugs. CHS was deactivated by the FBI in May 2023 for safety concerns. After deactivation, I learned that CHS was charged by local police for separate criminal conduct, including eluding law enforcement.

While in the driveway of 40 Pikes Hill Road, CHS called the Target Cell Phone and communicated with a female's voice who invited CHS inside of the residence. When CHS entered the residence, the live-monitoring electronic recording device captured CHS speaking with a female's voice and a child's voice in the background. After approximately 20 minutes, CHS exited 40 Pikes Hill Road and drove back to a predetermined meet location while being followed by me and other members of law enforcement.

10. Upon arrival at the predetermined meet location, CHS provided me with a yellow sandwich bag that contained a clear crystal-like substance, which I recognized to be suspected methamphetamine.[3] During the debrief interview, CHS reported that CHS purchased the suspected methamphetamine from Roberts inside of the residence. CHS further reported that Roberts had two ounces, rather than the previously discussed four ounces, available for purchase so CHS exchanged $1,000 with Roberts for two ounces of suspected methamphetamine. Additionally, CHS reported that Roberts told CHS that she was obtaining more methamphetamine later.

11. I personally reviewed the electronic recording that captured the controlled purchase, during which I heard a female's voice make multiple statements, including but not limited to, the following: (a) her current drug supply was low and that she would get more later; (b) she would sell CHS "two" now and "two" later; (c) she would charge CHS $1,000 for the two now and have CHS pay $500 for the final two; (d) the transaction was a buy three get one free deal; and (e) she was trying to get out of selling drugs. I also heard a child's voice, who the female identified by first name, talking and playing in the background of the recording.

---

[3] A TruNarc test of the suspected methamphetamine was presumptively positive for the presence of methamphetamine.

12. On about April 19, 2023, I submitted a preservation request to U.S. Cellular for the Target Cell Phone to preserve any records and information that have been collected and retained by U.S. Cellular in its normal course of business.

13. Based on my training and experience, and my conversations with other members of law enforcement who have conducted drug trafficking investigations, I know that drug distributors typically use one or more cellular telephones to communicate with their suppliers, customers, and co-conspirators and to engage in drug-related crimes. I also know that drug distributors frequently use their cellular telephones to send text messages, emails, and digital photographs in furtherance of their criminal activity, including both drug trafficking and the laundering of drug proceeds. The content of these communications commonly includes slang terms or other coded references to drug trafficking and drug proceeds in an effort to avoid detection.

14. Based on the foregoing facts, there is probable cause to collect information about the Target Cell Phone, which is currently stored at premises owned, maintained, controlled, or operated by U.S. Cellular, because such information will assist the FBI with gathering evidence about past, present, and future drug-related crimes involving Roberts and other unknown subjects.

## APPLICABLE CELLULAR TELEPHONE TECHNOLOGY

15. Based on my training and experience, I know that U.S. Cellular is a company that provides cellular telephone access to the public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for U.S. Cellular subscribers may be located on the computers of U.S. Cellular. In addition, I know that computers located at U.S. Cellular contain information and other stored electronic communications belonging to unrelated third parties.

16. Based on my training and experience, I know that wireless providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of U.S. Cellular for weeks or months.

17. Based on my training and experience, I also know that, among the services commonly offered by wireless providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my training and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by U.S. Cellular for short periods of time incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

18. Based on my training and experience, I know that wireless providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long-distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

19.     Based on my training and experience, I know that wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. The provider also may retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

20.     Based on my training and experience, many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

21.     Based on my training and experience, wireless providers also maintain business records and subscriber information for particular accounts in their ordinary course of business. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the

7

account, the subscribers' social security numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

22.     Based on my training and experience, wireless customers or subscribers occasionally may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## AUTHORIZATION REQUEST

23. Based on the foregoing, I request that the Court issue the proposed search warrant, under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A). The requested warrant requires U.S. Cellular to disclose to the government copies of any records and information (including the content of communications) about the Target Cell Phone that is described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized personnel will review that information to locate the items described in Section II of Attachment B. Because the requested warrant will be served on U.S. Cellular and U.S. Cellular personnel will compile the requested records and information at a time convenient to it, and because the time most convenient for U.S. Cellular personnel may be outside of normal business hours, good cause exists to permit the extraction of the requested records and information at any time of day or night.

Respectfully submitted,

Adam Morin, Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Jun 09 2023

City and state: Portland, Maine

Karen Frink Wolf, U.S. Magistrate Judge
*Printed name and title*

9